Filed 10/27/22  P. v. Rodriguez CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

THE PEOPLE,

　　　　Plaintiff and Respondent,

v.

ALFRED RAY RODRIGUEZ,

　　　　Defendant and Appellant.

E077794

(Super. Ct. No. FSB053198)

OPINION

APPEAL from the Superior Court of San Bernardino County.  Bryan Foster, Judge.  Affirmed.

Ronda G. Norris, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland , Assistant Attorney General, Charles C. Ragland, Arlene A. Sevidal, Lynne G. McGinnis and James H. Flaherty III, Deputy Attorneys General, for Plaintiff and Respondent.

1

# I.

## INTRODUCTION

Defendant and appellant Alfred Ray Rodriguez (Rodriguez) appeals the trial court's summary denial of his petition for resentencing pursuant to Penal Code section 1170.95.[1] He argues the trial court erred in denying his petition without issuing an order to show cause and holding an evidentiary hearing because it engaged in impermissible fact-finding. The record of conviction shows Rodriguez is ineligible for resentencing as a matter of law. We therefore affirm the trial court's order.

# II.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

Tina Lopez testified that she had spent the night of November 17, 2005, with Jerry Ramirez (Jerry), her boyfriend, at a motel. Tina telephoned her father, Benjamin, and asked for a ride. Edward Vincent Hernandez (Vinny) and Rodriguez, her cousins, picked her and Jerry up. No one seemed tense or angry.

---

[1] That section has since been renumbered as Penal Code section 1172.6. (Stats. 2022, ch. 58, § 10.) However, because that change was nonsubstantive and the parties cite to Penal Code section 1170.95, we will cite to Penal Code section 1170.95 for ease of reference. All further statutory references are to the Penal Code.

[2] The factual background is taken from this court's nonpublished opinion in defendant Rodriguez and codefendant Benjamin Hernandez's (Benjamin) prior appeal, case No. E046636, which is part of the record on appeal in this case. (*People v. Rodriguez et al.* (Sept. 28, 2010, E046636) [nonpub. opn.] (*Rodriguez I*).)

The group went to the home of Tina's aunt, where Jerry's brother, Eric Ramirez, lived. Eric testified he had been keeping a .22-caliber semiautomatic and a .22-caliber revolver, as well as a .25-caliber clip, for Jerry. Eric retrieved the guns and gave them to Jerry; Jerry unloaded the guns and gave them and the clip to Vinny, who owned one of the guns. Tina's aunt testified that about a year earlier, there had been problems between Vinny and Jerry.

The group then proceeded to a house on East Pumalo Street (the Pumalo house) where other extended family members lived. Tina's mother, Stella Lopez; Tina's aunt and uncle, Ruth and Edward Hernandez, Sr. (Edward); and Benjamin were all at the Pumalo house. Tina bickered with Benjamin while Rodriguez, Vinny, and Jerry were outside. Tina heard "loudness" in the backyard, and Benjamin went outside. Benjamin told Tina to stay in the house and told Stella to keep her there.

Curtis Hawkins, who lived behind the Pumalo house, heard a commotion. Through his bathroom window, he saw several men, including all four defendants, surrounding Jerry on the ground near the carport. Jerry was trying to escape but the others were blocking him. Hawkins heard Benjamin say, "You been fucking with my family. I'm going to kill you." Benjamin hit Jerry with a pointed edge shovel about 20 times in the head and torso while Jerry cried and pleaded for him to stop. Hawkins saw a pool of blood form around Jerry's head, and he heard Benjamin say, "Hurry up. Get my gun." Hawkins also heard someone say to get blankets. Vinny and Rodriguez rolled Jerry's motionless body up in blankets. Vinny backed a car up the driveway into the

3

carport, and Vinny and Rodriguez loaded Jerry into the trunk and drove off. Hawkins then saw Edward put some dirt over the blood and hose down the driveway and a car in the carport. A few minutes later, Hawkins heard Benjamin say to his daughter and another woman, "The same thing may happen to you." Hawkins did not contact the police because he feared for his own safety.

Another next-door neighbor, Vivian Jackson, heard screams. Jackson looked through the chain-link fence to see Vinny[3] beat a man on the ground with a shovel at least five times, while three or four other men beat, stomped, and kicked the victim. She could see blood on the ground. She heard the man she identified as Vinny say, "I told you not to play with me," and she heard the victim screaming "no." Jackson then walked away. Fifteen or 20 minutes later, she saw Edward hosing down what looked like blood from the carport area.

Alberta Hechtl, a security guard at a credit union adjacent to the Pumalo house, heard yelling, and although her view was partially obstructed, she saw an object like a shovel being driven up and down while a man screamed. She heard a woman yelling "leave him alone," and a man reply, "Get in the house."

---

[3] Although Jackson testified that the man with the shovel was Vinny, she had identified a photograph of Benjamin as the man who had used the shovel.

Tina told a detective and testified at the preliminary hearing that Benjamin came back inside and yelled to Vinny and Rodriguez to "[g]et him out of here" or to "[g]et rid of him." She then saw Vinny and Rodriguez push Jerry into the car, and she saw Vinny driving the car away.

Deputy Mark Addy of the San Bernardino County Sheriff's Department responded to a report of a domestic disturbance at the Pumalo house. He observed that Benjamin had what appeared to be fresh blood on his T-shirt and a fresh laceration above his eye. The deputy also saw someone washing a car in the carport.

Jerry's body was discovered in a ravine in Waterman Canyon on November 20, 2005. He had suffered numerous blunt and sharp force injuries, including defensive wounds on his arms, but the cause of death was seven close-range gunshot wounds to the head. Some of the blunt-force injuries on his back and buttocks area were consistent with kicking. The seven bullets were all .25-caliber and could only have been fired from a .25-caliber weapon.

Neither a gun nor the shovel was ever found.

The jury found Rodriguez guilty of second degree murder. (§ 187, subd. (a).)[4] The trial court sentenced Rodriguez to 15 years to life in prison.

---

[4] The jury also found Benjamin guilty of second degree murder. (§ 187, subd. (a).) The jury further found that Benjamin had used a deadly weapon, a shovel, in the commission of the crime (§ 12022, subd. (b)(1)).

Rodriguez subsequently appealed, arguing the evidence was insufficient to show he aided and abetted a codefendant[5] in killing the victim. We rejected Rodriguez's contentions and affirmed the judgment, concluding that the evidence overwhelmingly supported the jury's determination that Rodriguez was guilty of second degree murder. (See *Rodriguez I*, *supra*, E046636.)

On November 4, 2019, Rodriguez filed a second petition for resentencing under Senate Bill No. 1437 and section 1170.95, asking the court to vacate his murder conviction and to resentence him.[6] In the petition, Rodriguez declared that (1) a "complaint, information, or indictment was filed against [him] that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine"; (2) he "was convicted of 1st or 2nd degree murder pursuant to the felony murder rule or the natural and probable consequences doctrine";

---

[5] Rodriguez, Benjamin, and codefendants Vinny and Edward were all charged with first degree murder and conspiracy to commit murder with various weapon use allegations. Vinny's trial was severed from that of the others. The jury was unable to reach a verdict on the murder charge as to Edward and a mistrial was declared as to him.

Vinny and Edward were subsequently tried together. Vinny was found guilty of first degree murder and conspiracy to commit murder (§§ 187, subd. (a), 182, subd. (a)(1)), and the jury found true firearm use allegations as to him under section 12022.53, subdivisions (b), (c), and (d). The jury was again unable to reach a verdict as to the murder charge against Edward, and another mistrial was declared. Edward thereafter entered a plea of guilty to acting as an accessory to a felony (§ 32), and the murder charge against him was dismissed.

[6] Rodriguez's first petition was stricken as unconstitutional.

6

and (3) he "could not now be convicted of 1st or 2nd degree murder because of changes made to Penal Code § § 188 and 189, effective January 1, 2019."

The People filed an informal response on December 23, 2019, requesting the trial court take judicial notice of Rodriguez's record of conviction, including the instructions provided to the jury. The People argued that the petition should be denied because Rodriguez was not eligible for relief under section 1170.95 and that the jury instructions demonstrated Rodriguez's murder conviction "was not based upon felony murder or natural and probable consequences[.]"

Counsel was appointed for Rodriguez, and a hearing on the second petition was held on August 6, 2021. After hearing argument, the trial court found Rodriguez had not made a prima facie showing entitling him to relief and denied the petition.[7] The court noted Rodriguez's conviction had not been premised on the felony murder rule and concluded that there was "no question in everyone's mind they meant to kill the individual and they were all participants in the activity." Defendant timely appealed.

III.

DISCUSSION

Rodriguez contends the trial court erred in summarily denying his "facially sufficient" petition for resentencing without issuing an order to show cause and conducting an evidentiary hearing because the court engaged in impermissible fact-

---

[7] The trial court incorrectly stated, "I'm going to strike the petition," rather than stating "deny" the petition.

finding. He believes that although his jury was not instructed on a felony murder theory or under the natural and probable consequences doctrine, under the instructions given, Rodriguez could have been convicted on an imputed malice theory to prove the second degree murder conviction. We conclude that the trial court did not err in denying the petition after finding Rodriguez is not eligible for relief under section 1170.95.

Effective January 1, 2019, the Legislature passed Senate Bill No. 1437 to "'amend[] the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.'" (*People v. Gentile* (2020) 10 Cal.5th 830, 842 (*Gentile*); see Stats. 2018, ch. 1015, § 1, subd. (f).) The criminal liability of direct aiders and abettors did not change under Senate Bill No. 1437. (*People v. Offley* (2020) 48 Cal.App.5th 588, 595-596.)

Senate Bill No. 1437 eliminated the natural and probable consequences doctrine as a basis for finding a defendant guilty of murder and significantly limited the scope of the felony-murder rule. (*People v. Lewis* (2021) 11 Cal.5th 952, 957 (*Lewis*); *Gentile*, *supra*, 10 Cal.5th at pp. 842-843, 847-848.) As relevant here, under the natural and probable consequences doctrine, a person who knowingly aided and abetted a crime, the natural and probable consequence of which was murder, could be convicted of not only the target crime but also of the resulting murder, irrespective of whether he or she harbored malice aforethought. (*Gentile*, *supra*, at pp. 843-845; *People v. Offley*, *supra*, 48 Cal.App.5th at

8

p. 595.)  However, Senate Bill No. 1437 amended section 188 to provide that "[e]xcept as stated in subdivision (e) of [s]ection 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought.  Malice shall not be imputed to a person based solely on his or her participation in a crime."  (§ 188, subd. (a)(3); Stats. 2018, ch. 1015, § 2.)  "Senate Bill No. 1437 changed the circumstances under which a person could be convicted of murder without a showing of malice, but it did not exclude from liability persons convicted of murder for acting with implied malice."  (*People v. Soto* (2020) 51 Cal.App.5th 1043, 1057 (*Soto*), abrogated on another ground by *Lewis*, *supra*, 11 Cal.5th at p. 967.)

Senate Bill No. 1437 also "added section 1170.95 to provide a procedure for those convicted of felony murder or murder under the natural and probable consequences doctrine to seek relief."  (*Gentile*, *supra*, 10 Cal.5th at p. 843; see *Lewis*, *supra*, 11 Cal.5th at p. 959.)  Pursuant to section 1170.95, an offender must file a petition in the sentencing court declaring that:  "(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine . . . [;]  [¶]  (2) The petitioner was convicted of murder, attempted murder, or manslaughter following a trial or accepted a plea offer in lieu of a trial at which the petitioner could have been convicted of murder or attempted murder [;]  [¶]  [and] (3) The petitioner could not presently be convicted of murder or attempted murder because of changes to [s]ection

188 or 189 made effective January 1, 2019." (§ 1170.95, subds. (a)(1)-(3); see § 1170.95 subd. (b)(1)(A).)

The trial court then determines whether the petition is facially sufficient under section 1170.95, subdivision (b). (*Lewis*, *supra*, 11 Cal.5th at p. 960.) If the section 1170.95 petition contains all the required information, including a declaration by the petitioner that he or she was convicted of murder and could not now be convicted of murder because of changes to section 188 or 189 (§ 1170.95, subd. (b)(1)(A)), the court then must appoint counsel to represent the petitioner upon his or her request pursuant to section 1170.95, subdivision (c). (*Lewis*, *supra*, at pp. 957, 959-960, 966.) Further, upon the filing of a facially sufficient petition, the court must direct the prosecutor to file a response to the petition and permit the petitioner to file a reply, and the court must determine whether the petitioner has made a prima facie showing that he or she is entitled to relief. (See § 1170.95, subd. (c); *Lewis*, *supra*, at pp. 964, 966.)

In determining whether the petitioner has made a prima facie showing, "'"the court takes petitioner's factual allegations as true and makes a preliminary assessment regarding whether the petitioner would be entitled to relief if his or her factual allegations were proved. If so, the court must issue an order to show cause."' [Citations.] '[A] court should not reject the petitioner's factual allegations on credibility grounds without first conducting an evidentiary hearing.' [Citations.]" (*Lewis*, *supra*, 11 Cal.5th at p. 971.) "In reviewing any part of the record of conviction at this preliminary juncture, a trial court should not engage in 'factfinding involving the weighing of evidence or the

10

exercise of discretion.'" (*Id.* at p. 972.) "[T]he trial court should not decide unresolved factual issues that involve credibility determinations or weighing of evidence. Rather, it should decide such issues only after issuing an order to show cause and holding an evidentiary hearing." (*People v. Duchine* (2021) 60 Cal.App.5th 798, 811-812, fn. omitted.)

"Nevertheless, the court may appropriately deny a petition at the prima facie stage if the petitioner is ineligible for relief *as a matter of law*." (*People v. Harden* (2022) 76 Cal.App.5th 262, 270 (*Harden*).) "'"[I]f the record, including the court's own documents, 'contain[s] facts refuting the allegations made in the petition,' then 'the court is justified in making a credibility determination adverse to the petitioner,'"'" thereby deeming him or her ineligible. (*Lewis*, *supra*, 11 Cal.5th at p. 971.) For example, if the record shows that the jury was not instructed on either the natural and probable consequences or felony-murder doctrines, then the petitioner is ineligible for relief as a matter of law. [Citation.] A finding of ineligibility at the prima facie stage may also be based on a legal holding from a prior appellate opinion arising from the conviction. [Citation.]" (*People v. Harden*, *supra*, at p. 270, citing *People v. Daniel* (2020) 57 Cal.App.5th 666, 677 & *Lewis*, *supra*, at p. 972.)

"Appellate opinions . . . are generally considered to be part of the record of conviction." (*Lewis*, *supra*, 11 Cal.5th at p. 972.) "[T]here is no categorical bar to consulting the record of conviction at the prima facie stage." (*Id.* at p. 972, fn. 6.) "In sum, the parties can, and should, use the record of conviction to aid the trial court in

11

reliably assessing whether a petitioner has made a prima facie case for relief under [section 1170.95,] subdivision (c)." (*Id*. at p. 972, fn. omitted.) Furthermore, the court may rely on jury instructions, which are part of the record of conviction, to make the prima facie determination because the instructions "given at a petitioner's trial may provide 'readily ascertainable facts from the record' that refute the petitioner's showing, and reliance on them to make the eligibility or entitlement determinations may not amount to 'factfinding involving the weighing of evidence or the exercise of discretion.'" (*Soto*, *supra*, 51 Cal.App.5th at p. 1055.)

In October 2021, Senate Bill No. 775 was enacted and amended section 1170.95, effective on January 1, 2022. (2020-2021 Reg. Sess.; Stats. 2021, ch. 551, § 1.) As a result of the amendments, section 1170.95 clarified that "person convicted of felony murder or murder under the natural and probable consequences doctrine *or other theory under which malice is imputed to a person based solely on that person's participation in a crime*, attempted murder under the natural and probable consequences doctrine, or manslaughter," may file a petition to have that conviction vacated under certain circumstances. (§ 1170.95, subd. (a), italics added.)

If the petitioner makes a prima facie showing under section 1170.95, subdivision (c), the court must issue an order to show cause and hold a hearing "to determine whether to vacate the murder . . . conviction and to recall the sentence and resentence the petitioner on any remaining counts." (§ 1170.95, subd. (d)(1).) If a hearing is held, "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the

12

petitioner is guilty of murder or attempted murder under California law as amended by the changes to [s]ection 188 or 189 made effective January 1, 2019." (§ 1170.95, subd. (d)(3).) The prosecutor and the petitioner may offer new or additional evidence to meet their respective burdens at the hearing stage. The admission of evidence at the hearing is governed by the Evidence Code. However, the court also "may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed," as well as the "procedural history of the case recited in any prior appellate opinion." (§ 1170.95, subd. (d)(3).) Hearsay evidence that was admitted in a preliminary hearing pursuant to subdivision (b) of section 872 is inadmissible at the evidentiary hearing, unless made admissible by another exception to the hearsay rule. (§ 1170.95, subd. (d)(3).)

The prima facie determination under section 1170.95 is a question of law, and the court may deny a petition at the prima facie stage if the petitioner is ineligible for resentencing as a matter of law. (*Lewis*, *supra*, 11 Cal.5th at p. 966.) "We independently review a trial court's determination on whether a petitioner has made a prima facie showing. [Citation.]" (*Harden*, *supra*, 76 Cal.App.5th at p. 270.)

In this case, the jury was not instructed on felony murder and the natural and probable consequences doctrine, or any other theory of liability that would have permitted the jury to impute malice to Rodriguez. Rather the instructions were limited to direct aiding and abetting, express and implied malice, and premeditation and deliberation. Specifically, as pertinent here, the jury was instructed pursuant to

13

CALCRIM No. 400 on general aiding and abetting principles as follows: "A person may be guilty of a crime in two ways. One, he or she may have directly committed the crime. I will call that person the perpetrator. Two, he or she may have aided and abetted a perpetrator who directly committed the crime. A person is equally guilty of the crime whether he or she committed it personally or aided and abetted the perpetrator who committed it." The jury was also given CALCRIM No. 401, the direct aiding and abetting instruction, which provided in pertinent part: "To prove that a defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that: [¶] 1. The perpetrator committed the crime; [¶] 2. The defendant knew that the perpetrator intended to commit the crime; [¶] 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; [¶] AND [¶] 4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime. [¶] Someone *aids and abets* a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime." Notably, the trial court did not give either CALCRIM No. 402 [Natural and Probable Consequences Doctrine (Target and Non-Target Offenses Charged)] or CALCRIM No. 403 [Natural and Probable Consequences (Only Non-Target Offenses Charged)], both of which would have allowed the jury to convict Rodriguez if jurors found that the murder was the natural and probable consequences of another target crime. At trial, the prosecution argued two theories of murder liability, namely that Rodriguez (and his

14

codefendants) committed murder as either direct perpetrators or direct aiders and abettors.

The instruction on aiding and abetting in particular required that the aider and abettor "know[] of the perpetrator's unlawful purpose" and "specifically intend[] to, and [did] in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime." The jury was further instructed that, if it found a defendant guilty of murder, then it had to determine whether the murder was of the first or second degree. Specifically, the jury was instructed pursuant to CALCRIM No. 520 on express and implied malice in as follows: "The defendants are charged in Count one with murder. [¶] To prove that a defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant committed an act that caused the death of another person; [¶] AND [¶] 2. When the defendant acted, he had a state of mind called malice aforethought. [¶] There are two kinds of malice aforethought, express malice and implied malice. Proof of either is sufficient to establish the state of mind required for murder. [¶] The defendant acted with *express malice* if he unlawfully intended to kill. [¶] The defendant acted with *implied malice* if: [¶] 1. He intentionally committed an act; [¶] 2. The natural consequences of the act were dangerous to human life; [¶] 3. At the time he acted, he knew his act was dangerous to human life; [¶] AND [¶] 4. He deliberately acted with conscious disregard for human life. [¶] Malice aforethought does not require hatred or ill will toward the victim. It is a mental state that must be formed before the act that caused death is committed. It does not require deliberation or the passage of any particular

15

period of time. The jury found Rodriguez guilty of second degree murder. In other words, the jury rejected defense's theory of the case that he did not intend to commit murder and found that Rodriguez committed the murder, as either a direct perpetrator or a direct aider and abettor.

Although CALCRIM No. 520 used the term """"natural and probable consequences,"""" which could be similar to the natural and probable consequences doctrine, these are two "distinctly different concepts." (*Soto*, *supra*, 51 Cal.App.5th at p. 1056; accord, *People v. Chiu* (2014) 59 Cal.4th 155, 158, abrogated on another ground by Sen. Bill No. 1437 (2017-2018 Reg. Sess.).) The "natural consequences" language in instructions "does not transform [a petitioner's] conviction into one for murder under the natural and probable consequences doctrine within the meaning of section 1170.95." (*Soto*, *supra*, at p. 1059.)

A direct aider and abettor to murder must at least share the mens rea of the actual perpetrator, i.e., express or implied malice. (*Soto*, *supra*, 51 Cal.App.5th at p. 1057.) "For implied malice murder, [the requisite] intent is that the perpetrator '"knows that his conduct endangers the life of another and . . . acts with conscious disregard for life."' [Citation.] The 'physical component' required for implied malice murder 'is satisfied by the performance of "an act, the natural consequences of which are dangerous to life."'" (*Id*. at p. 1058.) In contrast, an accomplice whose liability for murder is premised on the natural and probable consequences doctrine "need only intend to aid a different, less serious 'target' crime," the natural and probable consequence of which is murder. (*Id*. at

16

p. 1057.) Here, the jury was not instructed on the natural and probable consequence doctrine or any target crime upon which murder based on a natural and probable consequences theory could be predicated. (See *People v. Daniel*, *supra*, 57 Cal.App.5th at p. 677 [defendant ineligible for relief where jury was not instructed on felony murder or natural and probable consequences doctrine]; *People v. Mancilla* (2021) 67 Cal.App.5th 854, 866-867 [conviction based on actual malice under provocative act theory].) Rodriguez was therefore necessarily convicted under a still-valid theory. (See *People v. Powell* (2021) 63 Cal.App.5th 689, 714 [rejecting the defendant's contention that direct aiding and abetting implied malice murder is an invalid legal theory].)

Rodriguez does not suggest his jury was instructed on the natural and probable consequences doctrine or the felony-murder rule, and the record in his direct appeal shows the jury was not instructed on those theories of liability. Therefore, Rodriguez is ineligible for relief under section 1170.95 as a matter of law.

Rodriguez argues he is eligible for relief under section 1170.95 because the trial court instructed the jury on aiding and abetting with CALCRIM No. 400, which was amended in 2011 after his trial.[8] He contends the "equally guilty" language was confusing and misleading because it suggested the jurors could (or even should) impute Vinny's or Benjamin's mental state to Rodriguez without considering Rodriguez's mental state. The possibility that Rodriguez could have been convicted at trial under an imputed

---

[8] In April 2010, the Judicial Council revised CALCRIM No. 400 to remove the word "equally" from the phrase "equally guilty." (*People v. Johnson* (2016) 62 Cal.4th 600, 640 & fn. 5.)

malice theory which is now invalid under section 188 was foreclosed by the trial court's additional instruction on aiding and abetting, CALCRIM No. 401. That instruction, as noted above, explained that an aider and abettor had to know the unlawful purpose of the perpetrator, intend to encourage or facilitate the commission of the crime, and by act or advice, aid or encourage the commission of the crime." Where, as here, the trial court instructs the jury with CALCRIM No. 401, there is no reasonable likelihood the jurors would have understood the equally guilty language [in CALCRIM former No. 400] to allow them to base defendant's liability for first degree murder on the mental state of the actual shooter, rather than on defendant's own mental state in aiding and abetting the killing. (*People v. Johnson* (2016) 62 Cal.4th 600, 641; see *id*. at pp. 640-641 [because the trial court "instructed the jury with CALCRIM No. 401, which sets out the requirements for establishing aider and abettor liability," the jury "was informed that for them to find defendant guilty of murder as an aider and abettor the prosecution must prove that [the] defendant knew [the perpetrator] intended to kill [the victim], that he intended to aid and abet [the perpetrator] in committing the killing, and that he did in fact aid him in that killing, which would have cleared up any ambiguity arguably presented by CALCRIM former No. 400's reference to principals being 'equally guilty'"].)

Because Rodriguez was not convicted of felony murder or murder under a natural and probable consequences or other imputed malice theory, he is ineligible for resentencing as a matter of law. We therefore conclude the trial court did not err in denying Rodriguez's petition for resentencing.

18

IV.

DISPOSITION

The order denying the petition for resentencing is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON

Acting P. J.

We concur:


FIELDS

J.


RAPHAEL

J.